UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

FAISAL AHMED,                    )
                                 )
            Petitioner,          )
                                 )
v.                               )        No. 3:16-CV-142
                                 )
MARDIA MOHSIN AHMED,             )
                                 )
            Respondent.          )

## MEMORANDUM OPINION

This civil action arises under the Convention on the Civil Aspects of International Child Abduction (a.k.a., the "Hague Convention"), codified as the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001, *et seq.* The petitioner, Faisal Ahmed (the "Father"), is a citizen of the United Kingdom and the respondent, Mardia Mohsin Ahmed (the "Mother"), is a citizen of the United States. Father contends that Mother has wrongfully removed the parties' twin daughters from their habitual residence in the U.K. to Knoxville, Tennessee. Mother denies that the U.K. is the habitual residence of the children.

Pursuant to the parties' agreement [Doc. 12] and Fed. R. Civ. P. 65(a)(2), a trial on the merits was held on June 13 and 14, 2016, in Knoxville, where both parties presented witnesses and exhibits. After carefully considering the evidence presented by both parties, their post-trial briefs [Docs. 29, 30], and the entire record in light of controlling law, the Court issues the following findings of fact and conclusions of law.

# I.    Findings of Fact[1]

As stated above, Father is a citizen of the United Kingdom and resides in London, England [Doc. 17 at ¶ 2; Doc. 28 at p. 30].[2]  Father has been and remains employed as an accountant in the U.K. and he has never applied for permission to reside or work in the United States [Doc. 28 at pp. 37—38, 121; Doc. 27 at p. 82].[3]

Mother is a citizen of the United States and resides in Knoxville, Tennessee [Doc. 17 at ¶ 3].  She is a licensed optometrist in the United States, but she is not licensed to practice optometry in the U.K. [Doc. 28 at pp. 54, 235, Doc. 27 at p. 28].

The parties were married on December 29, 2009, in Dhaka, Bangladesh, and they are still married [Doc. 17 at ¶ 8; Doc. 28 at p. 43].  At the time of their marriage, Father lived in London and Mother lived in Michigan, where she was studying optometry [Doc.

---

[1]The Court observes at the outset that, as explained *infra*, the only issue before it is to determine whether the United States or the United Kingdom is the "habitual residence" of the children under the Hague Convention.  The Court has no opinion as to the cause(s) of the deterioration of the parties' relationship or which parent should have custody of the children.  "The rights and wrongs of the actions of the respective parents are not before us for disposition on the merits." *Friedrich v. Friedrich*, 983 F.2d 1396, 1402 (6th Cir. 1993) ("*Friedrich I*"); *see also Panteleris v. Panteleris*, 601 F. App'x 345, 348 (6th Cir. 2015) ("the court does not consider whether the parent exercised the custody rights well or badly because those matters go to the merits of the custody decision and are, therefore, beyond the subject matter jurisdiction of the federal courts").  Much testimony and evidence was presented concerning the alleged faults and shortcomings of both parties and their family members.  However, this evidence has no bearing on the sole legal issue before the Court.

[2]The trial transcript of June 13, 2016 is contained in the record as Document 28 and the transcript of June 14, 2016 is contained in the record as Document 27.

[3]Mother testified that, while the parties were living in London in 2014, Father submitted an application for a U.S. green card, but that he advised her the application suffered water damage at the U.S. Embassy and he needed to submit another application [Doc. 27 at pp. 88—89].  There is no documentary evidence of any such application and Father denies that he ever applied for permanent residence in the U.S.  Mother also testified that they consulted with a U.S. immigration attorney in late 2014 about obtaining a green card for Father but no further action was taken [Doc. 28 at pp. 251, 253; Doc. 27 at p. 26].

28 at p. 47]. Following their wedding, Mother continued to live in the United States until August 2011 to finish her degree at the Michigan College of Optometry and to complete her clinical rotations [Doc. 28 at p. 50; Ex. P7 at MG000212]. Father visited Mother in Michigan five times during her rotations [*Id.*].

In August 2011, Mother moved to London to live with Father [Doc. 28 at p. 50]. At that time, Father claims "[t]he plan was always to live in London" [*Id.*]. Thus, Mother brought any items of sentimental value with her to London, such as her personal Quran, favorite clothes, favorite dressing gown, medical books, and personal lens kit [*Id.* at pp. 51—52]. She applied for and obtained a spousal visa to reside in the U.K. for up to 27 months [*Id.* at pp. 52—53; Ex. P2 at MG000003]. She worked as a researcher and began the steps to obtain her optometry license in the U.K. [Doc. 28 at p. 53]. Mother also obtained a National Insurance Number, similar to a U.S. Social Security number, which is a requirement for employment in the U.K. [*Id.* at p. 62; Ex. P2 at MG000181].

Approximately four months later, however, in December 2011, Mother returned to the United States and moved to Clarksville, Tennessee, because she needed additional training to obtain an optometry license in the U.K.[4] [Doc. 28 at p. 54]. During this period, Father visited Mother in Tennessee approximately four times and she came to London once [*Id.*]. In August 2013, Mother returned to London to live with Father, a move that she considered to be permanent at that time [*Id.*; Doc. 27 at pp. 60—61]. At

---

[4]In her ILR application, discussed *infra*, Mother explained that she must pass the Non EEA Doctor's Examination to become a licensed optometrist in the U.K. and she could not sit for the exam until she had documented at least one year of unsupervised work experience from the United States [Ex. P2 at MG000011, MG000054]. Thus, she returned to the U.S. to obtain the required experience.

3

almost all of the times the parties lived together in London, they lived in Father's parents' home [Doc. 28 at pp. 239—40].

In the fall of 2013, Mother obtained employment in London and began preparing for a series of six examinations required to practice optometry in the U.K. [Doc. 28 at pp. 69—74; Exs. P7, P8, P9, P10, P11; Doc. 27 at p. 61]. In April 2014, she submitted her application to the U.K. General Optical Council to sit for the examinations in June 2014 [Doc. 28 at p. 71; Ex. P7].

In October 2013, the parties submitted an application to the U.K. Border Agency for Mother's Indefinite Leave to Remain ("ILR") in the U.K. because, according to Father, "our intentions have been to live in the U.K." [*Id*. at p. 55, Ex. P2]. Notably, in support of the ILR application, Mother stated that "at all times during the last 2 years I have considered the UK as my permanent home" and she has "now permanently moved back to the UK" [Ex. P2 at MG000055].[5] Father also submitted a similar statement in support of the ILR application wherein he agreed with Mother's statement and that "we intend to continue to live together permanently" [*Id*. at MG000058—59]. The application was approved and, on March 16, 2014, Mother was issued an ILR Residence Permit allowing her to live in the U.K. for ten years [Ex. P4].

By all accounts, the parties' relationship was tumultuous and the acrimony seemed to escalate as time passed [Doc. 28 at p. 236]. Father describes Mother as "erratic" while she contends that he expected her to be "subservient" [Doc. 28 at p. 45; Doc. 27 at p. 33].

---

[5]Mother testified that Father prepared this statement and asked her to sign it without reading the whole statement [Doc. 27 at p. 41].

4

Both parties accuse the other of various wrongs and allege that their respective in-laws interfered in the relationship [Doc. 27 at pp. 45, 237]. Nevertheless, Mother became pregnant with the twins in February 2014 [Doc. 28 at p. 74]. It is undisputed that her pregnancy was difficult and she was bedridden for some of this time [*Id*. at p. 75].

Following a domestic argument in May 2014, Mother traveled from the U.K. to Knoxville, where she had previously lived and attended the University of Tennessee [Doc. 28 at p. 80]. Father claims the trip was for Mother to "cool down" [*Id*.]. Mother testified that she removed her jewelry from a bank locker and took her optometry instruments with her because she would not be returning to the U.K. [Doc. 28 at p. 245; Doc. 27 at p. 24]. Mother testified that she told Father at the time of her departure that she was not returning to the U.K., whereas Father testified that he was told and expected that Mother would return to the U.K. approximately one month later [Doc. 28 at pp. 81, 245]. Father did not speak with Mother for approximately one month following their domestic dispute and her travel to the U.S. [*Id*. at pp. 81, 84, 245].

It is undisputed that Father did not want Mother to travel to the U.S. [Doc. 28 at p. 81; Doc. 27 at p. 75]. Father intended for the children to be born and reside in London [Doc. 28 at p. 85]. Mother did not return to the U.K. in the summer of 2014 as she was unable to travel back to London [Doc. 28 at p. 85; Doc. 27 at p. 79]. She also testified that she chose not to return to the U.K. because of the issues in her marriage [Doc. 27 at p. 79].

Father traveled to Knoxville on October 9, 2014, and the twin daughters, An.Z.A. and Am.Z.A., were born on November 4, 2014 in Knoxville [Doc. 28 at pp. 76, 88, 91].

5

Mother does not dispute that Father assisted in caring for her and the children following their birth. Father did not obtain a Tennessee driver's license during his stay and he did not seek employment in the U.S. [Doc. 27 at pp. 80—81, 82].[6] Father did not bring his belongings to the U.S. other than those sufficient for his stay and he did not obtain U.S. health insurance [*Id*. at pp. 80, 82—83].

Shortly before the children's birth, Mother's parents purchased a home on Walcot Lane in Knoxville [Doc. 28 at p. 91]. The parties lived there prior to the children's birth with Mother's mother, sister, and brother [*Id*.]. Shortly after the children's birth, Father and Mother moved into an apartment leased for three months for which he paid the rent and utilities [Doc. 28 at pp. 89—90]. Mother testified that during this period she told Father that she was not going back to the U.K. and he was welcome to live with them in the U.S. [Doc. 28 at p. 254].

Upon the expiration of his 90-day visa, Father returned to London on January 5, 2015 [*Id.* at p. 89, 93]. Due to their small size, the children were not able to travel at this time and they remained in Knoxville with Mother [Doc. 28 at p. 93]. Mother and the children returned to the Walcot Lane residence and that has remained their residence in Knoxville ever since [Doc. 27 at p.79]. The record reflects that the children received significant medical and therapeutic care from the time of their birth until they traveled to the U.K. [Exs. R9, R18, R19]. Father returned to the United States on April 8, 2015, to accompany Mother and the children to the U.K. [Doc. 28 at p. 94]. Again, Father did not

---

[6]Father did have an international driving permit valid through February 2015 that allowed him to drive in the U.S. [Ex. R25].

seek employment in the U.S., he did not obtain a Tennessee driver's license, and he did not obtain U.S. health insurance [Doc. 27 at p. 84].

On May 18, 2015, the parties and their children traveled to the United Kingdom [*Id.* at p. 95, Ex. P35]. It is undisputed that Mother traveled to London on a round-trip ticket, with a return to Knoxville scheduled for November 15, 2015, so she could attend a professional conference and visit family [Doc. 28 at pp. 95—96].[7] The children, as U.S. citizens, had a 90-day visa to stay in the U.K. [Doc. 28 at p. 248].[8] Father testified that the family brought "everything of any value" with them to London [*Id.* at p. 97]. Mother testified that she did not bring her diplomas or her optometry instruments to the U.K., nor did she take the family jewelry that was "culturally and religiously … very important" to her and her family [Doc. 27 at pp. 14, 25; Doc. 28 at p. 154].

Mother testified that she agreed to travel to the U.K. "for a short summer visit" upon certain conditions that she wanted Father to fulfill "to see if our marriage was going to work" [Doc. 27 at pp. 46—47, 49]. Mother wanted them to have separate living arrangements from Father's family; she wanted the freedom and autonomy to drive and go out without questions; she wanted Father's parents not to interfere in their marriage or the parenting of the children; she wanted the freedom to work; until she became employed, she wanted an "allowance without any begging or asking for it"; and she wanted them to go to marriage counseling [Doc. 27 at pp. 46—47]. Mother's father,

---

[7]Father contends that the flight was booked as a round-trip ticket because it was less expensive than a one-way ticket [Doc. 28 at p. 127].
[8]The children have U.S. passports and U.S. Social Security cards [Doc. 28 at p. 254; Exs. R1, R2, R4].

7

Mohammed Mohsin, confirmed that his daughter's travel to London was contingent on these conditions [Doc. 27 at pp. 116—17]. In Mother's opinion, none of these conditions were met.

There is some evidence that Mother was considering returning to the U.K. on a more permanent basis. In January 2015, she inquired about taking the last of her U.K. optometry exams in June 2015 and Father paid the exam fee in April 2015 [Doc. 28 at pp. 72—74, Exs. P8, P9]. Mother did take the last license exam in June 2015 [Doc. 28 at p. 109]. However, there is also evidence in the children's medical records and through Mother's testimony that Mother and the children planned to travel internationally during the summer and then return to Knoxville [Doc. 27 at p. 261; Doc. 27 at pp. 12—13; Exs. R9, R19]. Mother's friend, Stacy Velazquez, similarly testified that Mother planned to visit the U.K., attend her brother's wedding in Bangladesh, and then return to Tennessee [Doc. 28 at pp. 218—19].

When the family returned to London, they again lived with Father's family [Doc. 28 at pp. 99, 103]. Father testified that the parties jointly decided to live with his parents so that Mother could focus on studying for her upcoming optometry exam [*Id*. at p. 103]. According to Father, they considered two nearby rental properties to move into, but the one Mother preferred would take longer for the current tenants to vacate [*Id*. at p. 104].

Mother brought copies of the children's U.S. medical records to London [Doc. 28 at pp. 98—99]. Mother registered the children with the U.K. National Health Service and obtained their "red books" so that they could receive medical care in the U.K. [*Id*. at p. 105, Ex. P33]. While in London, the children went to the family physician for a general

checkup [*Id*.]. On the other hand, when she traveled to London in May 2015, Mother did not sell her car in Tennessee or cancel her car insurance or the U.S. medical insurance for herself and the children [Doc. 28 at pp. 256—57]. Similarly, Mother renewed her Tennessee optometry license, her professional liability insurance, and paid the state privilege tax before she left for the U.K. [*Id*. at p. 266; Doc. 27 at p. 28; Exs. R10, R16, R26].

On July 12, 2015, Mother and the children traveled from London to Bangladesh, with Father's consent and accompanied by her father, to attend the wedding of Mother's brother [Doc. 17 at ¶ 22; Doc. 28 at p. 31]. Mother testified that she told Father at the time of their departure that they would not be returning to the U.K. [Doc. 27 at p. 51]. At the time of their departure, Mother and the children were scheduled to return to London on August 5, 2015 [Doc. 28 at p. 112]. They did not travel to London on August 5, but instead flew from Bangladesh to Knoxville, Tennessee [Doc. 28 at p. 31]. Mother's father made the travel arrangements, at Mother's request, for her and the children to travel from Bangladesh to the U.S. [Doc. 27 at p. 133]. Mother and the children have resided in Knoxville continuously since August 2015.

It is undisputed that Father did not consent to the children's travel to the United States nor to their retention in the United States [Doc. 28 at p. 33; Doc. 27 at pp. 101—102]. Father reported the children's abduction to the London Metropolitan police [Doc. 28 at pp. 108; Ex. D34]. On August 10, 2015, Father submitted an application for the return of the children in accordance with the Hague Convention to the United Kingdom Central Authority [Doc. 17 at ¶ 36; Doc. 1-5]. The request for return was then submitted

9

to the United States Department of State and the National Center for Missing and Exploited Children, which is the central authority of the United States under the Hague Convention [Doc. 17 at ¶ 36]. On August 28, 2015, the United States Department of State contacted the Mother and asked her for the voluntary return of the children to the United Kingdom [Doc. 17 at ¶ 37; Doc. 1-6]. This action was filed on March 23, 2016 [Doc. 1].

## II.     Conclusions of Law

The Hague Convention attempts to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as secure protection for rights of access." Hague Convention, pmbl.; *March v. Levine*, 249 F.3d 462, 465 (6th Cir. 2001). The Hague Convention's objectives are "to secure the prompt return of children wrongfully removed or retained in any Contracting State" and "to ensure that rights of custody and of access under the law of the Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1; *McKie v. Jude*, No. 10-103-DLB, 2011 WL 53058, at *4 (E.D. Ky. Jan. 7, 2011). The United Kingdom and the United States are signatories to the Hague Convention.

This Court, along with state courts, has concurrent jurisdiction over claims arising under the Hague Convention. 22 U.S.C. § 9003(a). The ICARA prohibits courts from making a final determination as to the child's custody; instead, courts only determine which country should try the underlying custody dispute. *Friedrich v. Friedrich*, 78 F.3d

10

1060, 1063 (6th Cir. 1996) ("*Friedrich II*") (citing Hague Convention, art. 19); *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) ("the courts of signatory nations may only determine the merits of the abduction claim"). The Hague Convention is "intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Panteleris v. Panteleris*, 601 F. App'x 345, 347 (6th Cir. 2015) (citing *Friedrich II*, 78 F.3d at 1064). Further, the nature of these cases requires an expeditious resolution. Hague Convention, art. 11; *March*, 249 F.3d at 474.

Under the ICARA, the petitioner has the burden of demonstrating by a preponderance of the evidence that the child was "wrongfully removed or retained in breach of his custody rights under the laws of the Contracting State" in which the child "habitually resided" before she was removed or retained. 22 U.S.C . § 9003(e)(1); Hague Convention, arts. 3, 12; *March*, 249 F.3d at 465—66. If the petitioner is able to demonstrate that the child was wrongfully removed from its habitual residence, then the child must be returned to the country of the child's habitual residence for a custody determination, unless the respondent can establish that she is able to meet certain exceptions under ICARA which do not appear to be relevant to the instant case.[9] Hague Convention, arts. 12, 13, 20.

---

[9]One of the exceptions requires the respondent to prove by clear and convincing evidence that there is a grave risk that returning the children would expose them to physical or psychological harm. 22 U.S.C. § 9003(e)(2)(A); *Friedrich II*, 78 F.3d at 1067. The "grave risk of harm" exception is to be interpreted narrowly so as to avoid the exception swallowing the rule and the risk to the children must be grave, not merely serious. *Simcox v. Simcox*, 511 F.3d 594, 604—05 (6th Cir. 2007); *see Feder v. Evans-Feder*, 63 F.3d 217, 226 (3d Cir. 1995) ("the exceptions are narrowly drawn, lest their application undermine the express purposes of the Convention"). While Mother has alleged that Father was physically, emotionally, and verbally abusive to her

The Hague Convention defines the removal of a child from one nation to another as "wrongful" when:

> (a)     it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b)     at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3; *Robert*, 507 F.3d at 988.

In order to determine whether the child was wrongfully removed, the petitioner must first demonstrate that the child was removed from the country of her habitual residence. Then, petitioner must demonstrate by a preponderance of the evidence that the child's removal was in breach of the petitioner's custody rights pursuant to the laws of the country of the child's habitual residence, and that petitioner was actually exercising those custody rights. *Friedrich II*, 78 F.3d at 1064—66; *March v. Levine*, 136 F. Supp. 2d 831, 842 (M.D. Tenn. 2000). If the Court finds that petitioner was actually exercising custody rights over the children, its inquiry "should stop – completely avoiding the question of whether the parent exercised the custody rights well or badly." *Friedrich II*, 78 F.3d at 1066. In the instant case, there is no real dispute that Father has custody rights under the laws of the U.K. and that he was exercising those rights at the time Mother and the children traveled to the United States in August 2015.[10]

---

[Doc. 28 at p. 264], there are no allegations or evidence that he was abusive in any way to the children or that there is a threat of harm to the children in the U.K.

[10]Although Mother's post-trial brief suggests that Father cannot meet these two factors [Doc. 30 at p. 31], Mother has offered no real argument or proof to dispute that Father had custody rights

Although the difference primarily relates to the one-year time period to file an action, Hague Convention, art. 12, it is worth discussing the difference between wrongful removal and wrongful retention cases. Wrongful removal cases are described as taking the child "from the person who was actually exercising custody of the child," whereas wrongful retention cases involve "keeping the child without the consent of the person who was actually exercising custody." *Guevara v. Soto*, No. 3:15-CV-548-TAV-CCS, 2016 WL 1558384, at *5 (E.D. Tenn. Apr. 15, 2016) (Varlan, C.J.); *March v. Levine*, 136 F. Supp. 2d at 835 (citing 51 Fed. Reg. 10494, 10503 (1986)). In the instant case, it is undisputed that Father consented to Mother taking the children to Bangladesh in July 2015 to attend a family wedding. However, Father testified that he expected Mother and the children to return to London and it is undisputed that he did not give consent for them to travel to the United States or to remain there. *See Feder*, 63 F.3d at 220, n.4 (father consented to mother's removing child from Australia to the U.S. but did not consent to the child being retained there). Thus, it appears that this is more appropriately considered a case of wrongful retention and that the date of retention is August 5, 2015. There is no dispute that Father initiated this action within one year of the children's retention in the U.S. [Doc. 19 at ¶ 42].

---

to the children under the laws of the U.K. or that he was actually exercising those rights at the time the children left London for Bangladesh and then the United States. Indeed, the proof supports the conclusion that he has established both of these points. *See Panteleris*, 601 F. App'x at 348 ("a person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child") (quoting *Friedrich II*, 78 F.3d at 1066).

Thus, the primary issue in this case is whether the children's habitual residence was the U.K., as alleged by Father, or the U.S., as alleged by Mother. The Hague Convention does not define the term "habitual residence," but it has been described by the Sixth Circuit as the country where, at the time of removal or retention, "the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009) (quoting *Robert*, 507 F.3d at 993). A child "can have only one habitual residence." *Simcox*, 511 F.3d at 602 (quoting *Friedrich I*, 983 F.2d at 1401). The Court "must look back in time, not forward" to determine a child's habitual residence and "focus on the child, not the parents, and examine past experience, not future intentions." *Friedrich I*, 983 F.2d at 1401. The determination of a child's habitual residence is a question of fact. *Panteleris*, 601 F. App'x at 349; *Robert*, 507 F.3d at 995.

The Sixth Circuit has outlined the following principles for the Court to consider in determining the children's habitual residence:

> First, habitual residence should not be determined through the technical rules governing legal residence or common law domicile. Instead, courts should look closely at the facts and circumstances of each case. Second, because the Hague Convention is concerned with the habitual residence of the child, the court should consider only the child's experience in determining habitual residence. Third, this inquiry should focus exclusively on the child's past experience. Any future plans that the parents may have are irrelevant to our inquiry. Fourth, a person can have only one habitual residence. Finally, a child's habitual residence is not determined by the nationality of the child's primary care-giver. Only a change in geography and the passage of time may combine to establish a new habitual residence.

*Panteleris*, 601 F. App'x at 349 (quoting *Robert*, 507 F.3d at 989).

A frequently cited case from the U.K. describes a "settled purpose" as where "the purpose of living where one does has a sufficient degree of continuity to be properly described as settled." *Feder*, 63 F.3d at 223 (quoting *In re Bates*, No. CA 122-89, High Court of Justice, Family Div'l Ct. Royal Courts of Justice, United Kingdom (1989)); *see Mozes v. Mozes*, 239 F.3d 1067, 1074 (9th Cir. 2001) ("Being habitually resident in a place must mean that you are, in some sense, 'settled' there – but it need not mean that's where you plan to leave your bones."). The determination of a child's "acclimatization" or "settled purpose" may include consideration of the child's academic activities, social engagements, sports programs, excursions, and meaningful connections with people and places. *Robert*, 507 F.3d at 996 (citing *Karkkainen v. Kovalchuk*, 445 F.3d 280, 293—94 (3d Cir. 2006)).

As noted by other courts, the determination of the habitual residence of an infant or very young child, as in the instant case, is a more difficult question. The Sixth Circuit has acknowledged that the standard of "acclimatization" and "a degree of settled purpose," "may not be appropriate in cases involving infants or other very young children." *Simcox*, 511 F.3d at 602, n.2; *Robert*, 507 F.3d at 992, n.4 ("we recognize that a very young … child may lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose … [w]e therefore express no opinion on whether the habitual residence of a child who lacks cognizance of his or her surroundings should be determined by considering the subjective intentions of his or her parents"). The reason the "acclimatization" standard is ill-fitting to the case of an infant or very young child is that the child is naturally "entirely

15

dependent on its parents." *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004). Infants do not develop a "settled purpose" or "firmly rooted" ties to a location through school, friendships, or other activities as older children do. *Id*. at 1019. Unfortunately, the Sixth Circuit has not yet articulated an alternative standard or considerations for determining the habitual residence of an infant.

Other circuits have considered the parents' "shared intent" in determining the habitual residence of an infant or very young child. *See, e.g., Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013); *Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010); *Barzilay v. Barzilay*, 600 F.3d 912, 918 (8th Cir. 2010); *Holder*, 392 F.3d at 1020—21; *Whiting v. Krassner*, 391 F.3d 540, 548—49 (3rd Cir. 2004); *Mozes*, 239 F.3d at 1081. These courts have concluded that "shared parental intent prior to the wrongful removal or retention is central to the determination" of an infant's habitual residence and "a newborn's place of birth does not automatically bestow upon that child a habitual residence." *McKie*, 2011 WL 53058, at *10; *see Whiting*, 391 F.3d at 550 ("when the child involved is very young … acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence"); *Karkkainen*, 445 F.3d at 296 ("[a]cclimatization is an ineffectual standard by which to judge habitual residence in such circumstances because the child lacks the ability to truly acclimatize to a new environment. … shared parental intent that a very young child will reside in a new country, even for a limited period of time, is sufficient to establish the child's habitual residence in that country"). Parental intent "gives contour to the objective, factual circumstances surrounding the child's presence in a given location

16

… particularly where the facts present a newborn or extremely young infant who lacks the relative cognizance to attach to those circumstances anything remotely approaching 'settled purpose.'" *McKie*, 2011 WL 53058, at *10 (quoting *Gitter v. Gitter*, 396 F.3d 124, 132 (2nd Cir. 2005)). The parties encourage this Court to follow the path of other circuits and consider the parents' shared intent in determining the habitual residence of the children [Doc. 29 at p. 5; Doc. 30 at p. 24]. This path presents several complications for the Court.

First, the Sixth Circuit has expressly rejected the consideration of "shared parental intent" in determining a child's habitual residence. *Robert*, 507 F.3d at 990—91 ("the rule handed down in *Mozes* … is incompatible with this Court['s] decision in *Friedrich I*. … the court below should have focused solely on the past experiences of the child, not the intentions of the parents"); *see Panteleris*, 601 F. App'x at 350 ("[w]e need not decide whether the Pantelerises' subjective intent should be considered because it would not change the outcome in this case"); *McKie*, 2011 WL 53058, at *8; *Flores-Aldape v. Kamash*, No. 3:15CV2076, 2016 WL 4430835, at *5 (N.D. Ohio Aug. 22, 2016); *Redmond*, 724 F.3d at 744 ("the Sixth Circuit focuses on habitual residence from the child's perspective, downplaying parental intent"). This Court is obligated to follow the precedent established by the Sixth Circuit and takes great pause before adopting a standard that has been repudiated by the Sixth Circuit, no matter that other courts have done so. Thus, this Court is presented with the situation where the Sixth Circuit has acknowledged that the "acclimatization" standard that this Court is bound to follow may

be insufficient for cases such as this, but the proposed alternative standard of "shared parental intent" has been rejected.[11]

Moreover, the "shared parental intent" standard provides little help when the intent of the parents is not shared, but divergent. *See Delvoye v. Lee*, 329 F.3d 330, 333 (3rd Cir. 2003); *Kijowska v. Haines*, 463 F.3d 583, 587 (7th Cir. 2006) ("The cases speak of the 'shared intent' of the parents, … but that formula does not work when as in this case the parents are estranged essentially from the outset, the birth of the child (or indeed before).").  As noted by another district court in this Circuit, shared intent may be "difficult to determine when parents disagree on where a child's habitual residence should be fixed." *McKie*, 2011 WL 53058 at *11.  In such cases, the *McKie* court suggests that "the representations of the parties cannot be accepted at face value" and courts must consider "all available evidence." *Id*. (quoting *Mozes*, 239 F.3d at 1076); *see Holder*, 392 F.3d at 1017 ("when the parents no longer agree on where the children's habitual residence has been fixed, we must look beyond the representations of the parties and consider 'all available evidence'"); *Gitter,* 396 F.3d at 133 ("In nearly all of the cases that arise under the Convention ... the parents have come to disagree as to the place of the child's habitual residence. It then becomes the court's task to determine the intentions of the parents as of the last time that their intentions were shared."); *Norinder v. Fuentes*, 657 F.3d 526, 534 (11th Cir. 2011) ("Often parents will not agree about what their shared

---

[11]The Court also observes that in cases such as this one, involving infants or very young children, there is little else available to consider beyond the objective facts of the children's short lives and the parents' intentions.

intentions were once litigation is underway, and so we must take account of the parents' actions as well as what they say").

Thus, in the absence of clear direction from the Sixth Circuit and without expressly adopting the "shared parental intent" standard, the Court finds that consideration of all available evidence, looking backward and focusing on the children's past experience, is an appropriate path forward and consistent with the admonition in *Robert* to "look closely at the facts and circumstances of each case." 507 F.3d at 989.

It is undisputed that the children were born in the United States in November 2014 and spent the first six months of their lives in the United States. The children lived for approximately two of these months in an apartment with both parents, but the majority of this period was spent at the residence owned by Mother's parents on Walcot Lane with Mother, Mother's sister, and, sometimes Mother's mother. The children received significant medical and therapeutic care in the U.S. and they were covered by U.S. health insurance.

It is further undisputed that the children then traveled with their parents to London in May 2015 where they lived for approximately seven to eight weeks, before traveling to Bangladesh for a family wedding. They lived in the home of Father's family, staying in one room with both parents. The children were registered with the National Health Service and had at least one medical check-up in London. On August 5, 2015, the children and Mother traveled from Bangladesh to the United States and they have resided in Knoxville continuously since then. Father's position is that the eight-week period that the children lived in London, along with the parties' prior shared intent, established the

U.K. as their habitual residence [Doc. 29 at pp. 18—19]. Mother's position is that the United States is the children's habitual residence and that was not changed by the children's visit to the U.K. [Doc. 30 at p. 13].

As with the cases cited above, given their young age, it is difficult to conclude how much the children have acclimated or become settled in the U.S. versus the amount of acclimatization that occurred during their time in the U.K. The children are still too young for school, sports or other extra-curricular activities, or meaningful friendships. Although not explicitly stated as such in the record, the children were surrounded by extended family members in both countries. The evidence reflects that the children received adequate medical care, as needed, in both countries, and there is no evidence that their physical, emotional, or developmental needs were lacking in any way in either location. The record reflects evidence of family celebrations in both countries and that the children have ample clothes, toys, and the other material necessities of infant and toddler care in both homes.

Thus, the facts and circumstances of the children's past experience does not tilt the scale strongly in one way over the other, with the exception of the amount of time spent in each country. It cannot be disputed that the children have spent most of their lives in the U.S., including most of their lives prior to the date of retention. While it is well settled that the "place of birth is not automatically the child's habitual residence," *Holder*, 392 F.3d at 1020, and that "a change in geography and the passage of time may combine to establish a new habitual residence," *Robert*, 507 F.3d at 989, the Court questions

whether the children's limited time in the U.K. was sufficient to establish a new habitual residence.

To the extent that the parents' intent is relevant, it is fair to say that there is no evidence that Father ever had any settled intent to live in the U.S., although there is some evidence that the parties discussed it and perhaps even made preliminary inquiries about the possibility of him obtaining permanent resident status in the U.S. However, it does not appear that the parties took any substantial steps toward that goal. Thus, the Court does not find that the preponderance of the evidence shows a settled mutual intent to live in the U.S.

It is also fair to say that Mother's intent has been less than settled over time. The record reflects that she intended to make the U.K. her permanent residence in the fall of 2011, but, in order to obtain an optometry license in the U.K., she returned to the U.S. to obtain further experience. Thus, although she was living in the U.S. for approximately 18 months from December 2011 to August 2013, her purpose for doing so was in order to further her goal of ultimately living and working in the U.K. The parties' statements in the 2013 ILR petition support this conclusion. Although Mother claims that her ILR statement was prepared by her husband and she signed it without reading it, she nevertheless returned to the U.K. in August 2013 and began taking steps to obtain her optometry license and find employment. Thus, the Court concludes that the parties had a shared intent to live in the U.K. in the fall of 2013.

However, the record also reflects that the intent to live in the U.K. was no longer shared by the parties by the time Mother traveled to the U.S. in May 2014. It is unclear at

what point Mother's intent changed, but she testified that she took her valuable possessions with her when she traveled to the U.S. because she did not intend to return to London. She claims that she told Father she would not be returning to the U.K., although he claims he thought she was merely traveling for a month to "cool off" and she would then return to the U.K.

There is no evidence that the parties' intent on a joint residence ever became shared again. As noted above, Father came to the U.S. for the children's birth and stayed approximately two months thereafter caring for them and Mother. Although Mother claims that they consulted with an immigration attorney about Father obtaining a green card, it is undisputed that they took no further steps to obtain one or otherwise obtain a more permanent residency status for him. At the expiration of his visa, Father returned to the U.K. and Mother and the children remained in the U.S. Father claims this is because the children were too small to travel, but Mother claims that she told him she was not going back to the U.K.

Father returned to the U.S. in April 2015 and he accompanied Mother and the children to the U.K. in May 2015. Father claims the purpose of this move was for the family to permanently settle in the U.K. Mother claims, with supporting evidence from her father and Ms. Velazquez, that this was a "summer trip" to see if Father would meet her conditions for continuing their marriage and living in London. Further, it appears that Mother described the trip in a similar way to the children's medical providers and made plans for future appointments in the U.S. when they returned. Mother traveled on a round-trip ticket, thus planning to return to the U.S., albeit not for nearly six months.

Although Father testified that Mother traveled on a round-trip ticket because it was cheaper, he also acknowledged that she planned to attend a professional conference in the U.S. and visit family. Mother did not bring substantial or valuable belongings with her to the U.K. and she took no steps to discontinue her optometry licensure, professional liability insurance, health insurance, or car insurance in the U.S., all of which provide some evidence of an intent to return to the U.S.

Father points to the fact that Mother brought copies of the children's U.S. medical records to the U.K. for transfer to their U.K. physician. Mother registered the children with the National Health Service, obtained their red books, and took them for a checkup in London. Mother also took the last of her U.K. optometry exams. All of this leads the Court to conclude there was no settled intent on the part of the Mother during her 2015 visit to the U.K. She was testing the waters and could have gone either way.

By the conclusion of her 2015 visit to the U.K., however, it appears that Mother had decided not to live in the U.K. She told Father that she was not coming back to the U.K., although he testified that he expected her to return to London. Mother obtained her father's assistance in making flight arrangements and traveling with the children to Bangladesh for her brother's wedding. While in Bangladesh, her travel arrangements were changed so that she and the children would fly from Bangladesh to the U.S. instead of to the U.K.

Thus, the preponderance of the evidence demonstrates that the parties had no settled mutual intent to live in either the U.S. or the U.K. on August 5, 2015, the date of the children's retention. At that time, Father's intent was to live in the U.K. and Mother's

intent was to live in the U.S. Looking backward from that date, there was no settled mutual intent during the children's lives and much of Mother's pregnancy.

Father emphasizes that one parent's unilateral intent cannot change the children's habitual residence, relying on *Uzoh v. Uzoh*, 2012 WL 1565345 (N.D. Ill. May 2, 2012) [Doc. 29 pp. 8, 29—30]. In *Uzoh*, the parents lived in Bristol, England and the parties agreed that the mother would travel to Denver, Colorado in 2009 to give birth to their daughter and she did so. *Id.* at *1. The mother and child returned to England. Then, in 2011, when the mother was pregnant with their second child, the parties again agreed that she would travel to Denver to give birth. *Id.* at *2. However, this time, the mother did not want to return to England and remained in the U.S. with the parties' children. *Id.* The parties' shared actions and intent prior to his birth was that the newborn son would reside in the family home in England. The court determined that, although he had never lived in the U.K., the habitual residence of the parties' son was the U.K. *Id.* at *5.

The Court agrees with the *Uzoh* court's admonition that one parent's unilateral intent alone cannot alter the child's habitual residence. As noted by other courts, such a policy "would invite abduction" and run counter to the very purpose of the Hague Convention. *See Kijowska*, 463 F.3d at 587. However, the key distinction between *Uzoh* and the instant case is that the *Uzoh* parents had a shared intent for the children, including the newborn, to reside in England. The mother changed her mind *after* the children were retained in the U.S. *See McKie*, 2011 WL 53058, at *14 ("courts have rejected unilateral intent changes subsequent to a child's removal"). In the instant case, there was no shared

intent as to the parties' habitual residence as of May 2014, prior to the children's birth.[12]

Mother changed her mind about where she intended to live well before the date of retention.

For similar reasons, the Court finds that the other authorities relied upon by Father to be unpersuasive [Doc. 29 at pp. 6—9]. In *Sanchez-Londono v. Gonzalez*, 752 F.3d 533 (1st Cir. 2014),[13] *Nicolson*, 605 F.3d 100 (1st Cir. 2010), and *Feder*, 63 F.3d 217 (3rd Cir. 1995), the complained-of change in one parent's intent occurred well after the birth of the child and after the date of removal or retention. As discussed above, the parties in this case had no shared intent as to the children's residence as of May 2014, prior to the children's birth and prior to the date of retention. The fact that the parties did, at one time, share an intent to live in the U.K., does not bind them to that intent indefinitely. As noted by the Seventh Circuit in *Redmond*, "the concept of 'last shared parental intent' is not a fixed doctrinal requirement, and we think it unwise to set in stone the relative weights of parental intent and the child's acclimatization." 724 F.3d at 746. Instead, the determination of habitual residence is "a practical, flexible, factual inquiry that accounts for all available relevant evidence and considers the individual circumstances of each case." *Id*. at 732.

---

[12]This point highlights an unanswered question in the case law. If parental intent is to be considered, how far back should a court look in considering the parents' intent? From the date of removal/retention back to the date of birth or conception? Prior to the date of conception? And if the parents' intent changes from shared to divergent during this time period, at what point does the shared intent become controlling over the later conflicting intent?

[13]It is also worth noting that the *Sanchez-Londono* court's determination of habitual residence "begins with the parents' shared intent or settled purpose" and considers the child's acclimatization "[a]s a secondary factor." 752 F.3d at 540. This formulation of habitual residence is contrary to the standard promulgated by the Sixth Circuit in *Robert*.

25

Moreover, from the time of their birth to the date of retention, the children lived primarily in the U.S. While the place of their birth is not automatically the children's habitual residence, *Holder*, 392 F.3d at 1020, the Court simply cannot conclude that the seven to eight-week period the children spent in the U.K. is sufficient to establish that as a habitual or settled residence. *See McKie*, 2011 WL 53058, at *13; *Kijowska*, 463 F.3d at 587 (infant's two month "brief sojourn" in the U.S. did not establish that as her habitual residence); *Papakosmas v. Papakosmas*, 483 F.3d 617, 627 (9th Cir. 2007) (four months was an insufficient time for the children to develop deep-rooted ties to the new location). The preponderance of the evidence indicates that Mother and the children traveled to the U.K. to visit and for Mother to determine whether she wanted to live with Father in the U.K. or return to the U.S. They did not bring all of their belongings to the U.K. and Mother did not sever her ties to living and working in the U.S. The children, as U.S. citizens, could only stay in the U.K. for three months. There is simply insufficient evidence that the children established deep-rooted ties or a degree of settled purpose in the U.K. in this limited time. *Holder*, 392 F.3d at 1021; *Delvoye*, 329 F.3d at 334.

Based on a preponderance of the evidence, the Court concludes that the facts and circumstances of the children's past experience does not establish the U.K. as the children's habitual residence. Accordingly, because the Court concludes that the U.K. was not the children's habitual residence, their retention in the U.S. was not "wrongful" within the meaning of the Hague Convention.

**III.     Conclusion**

As other courts have noted, cases under the Hague Convention require the Court to "grapple with difficult factual circumstances in which no outcome may appear ideal." *Mendez v. May*, 778 F.3d 337, 347 (1st Cir. 2015).  This is just such a case.  For the reasons set forth herein, the Court will **DENY** Father's petition for the return of his children to the U.K.  An appropriate order will be entered.


    s/ Thomas W. Phillips
SENIOR UNITED STATES DISTRICT JUDGE